CHARLES H. PARKER & others *vs.* COMMONWEALTH.
FERREE BRINTON & others *vs.* SAME.
GEORGE F. PARKMAN *vs.* SAME.

Suffolk. January 17, 18, 1901. — March 1, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

St. 1899, c. 457, limiting the height of buildings within a certain described territory west of the State House in Boston to seventy feet, and providing that "If and in so far as this act, or proceedings to enforce it, may deprive any person of rights existing under the Constitution," the owners of the land thus restricted may have their damages assessed by a jury, does not contain an adjudication that the public welfare requires that the landowners' property should be restricted without compensation to them, and, without such adjudication by the Legislature, the statute does not deprive the landowners of their rights to compensation for the taking of their right to build above seventy feet. Whether a clear expression by the Legislature of its intent to restrict these buildings in the exercise of its police power without compensation to the owners would infringe the Constitution, *quære.*

THREE PETITIONS for the assessment of damages under St. 1899, c. 457, limiting the height of buildings in the vicinity of

the State House in Boston, filed respectively in November and December, 1899, and May, 1900.

The petitioners were respectively the owners of different parcels of land within the restricted territory described in the act above named. In each case the Commonwealth demurred, and in the Superior Court *Braley*, J. made orders sustaining the demurrers, and being of opinion that the matter ought to be determined by the full court before further proceedings were had in the trial court, at the request of the parties, reported the cases for the consideration of this court.

St. 1899, c. 457, was passed by the Legislature on June 2, 1899, and was entitled " An Act to limit the height of buildings in the vicinity of the State House."

The act was as follows: " Section 1. Any building now being built or hereafter to be built, rebuilt or altered in that part of the city of Boston which lies within the following described territory, to wit: — Beginning at the corner of Beacon street and Hancock avenue, thence continuing westerly on Beacon street to Joy street, thence continuing northerly on Joy street to Myrtle street, thence continuing easterly on Myrtle street to Hancock street, thence continuing southerly on Hancock street and Hancock avenue to the point of beginning, — may be completed, built, rebuilt or altered to the height of seventy feet measured on its principal front and no higher: *provided, however*, that there may be erected on any such building above the limits hereinbefore prescribed, such chimneys and ornamental features as the commissioner of buildings of the city of Boston may approve, but said ornamental features shall not be such as to increase the interior capacity of said buildings.

" Section 2. If and in so far as this act, or proceedings to enforce it, may deprive any person of rights existing under the constitution, any such person now owning land within the district above described, sustaining damages in his property by reason of the limitations of the height provided for in this act of any building on or to be placed on such land may recover from the Commonwealth such damages, as determined by a jury of the superior court for the county of Suffolk, on his petition therefor filed in the office of the clerk of said court within one year after the passage of this act, such determination and pay-

ment of the damages to be made under the same rules of law, so far as applicable, as govern the determination and payment of damages for the taking of lands for highways in said city."

It was agreed that the following facts might be taken as true, and considered as alleged in the petition:

The territory described in the act lies west of the State House grounds and adjacent thereto, being separated therefrom by Hancock Street, Mt. Vernon Street and Hancock Avenue. The plan attached to the record was printed from a tracing from the atlas of the city of Boston. The following is a copy:

Mt. Vernon Place and Hancock Avenue are public streets as are the other streets shown on the plan except Joy Place.

The point in the restricted territory most remote from the State House is at the corner of Beacon and Joy Streets, and is four hundred feet distant from the nearest part of the State House. The shortest distance between the State House and Joy Street, taken in a line perpendicular to Joy Street, is one hundred and eighty-five feet. The length of the territory is the length of the State House and its grounds.

The land between Bowdoin Street and the State House was taken in fee by the Commonwealth under authority of the Legislature before 1899. The land to the north of the State House on Derne Street is still owned by private individuals.

At the date of the passage of the act, none of the buildings erected within the restricted territory exceeded or equalled the prescribed limit of seventy feet in height; the Hotel Otis, at the northeast corner of Joy and Mt. Vernon Streets, having its principal front on Mt. Vernon Street, was sixty-eight feet in height, exclusive of chimneys, measured on the principal front, but there were several buildings on the westerly side of Joy Street, and also to the east of the State House grounds and in their vicinity, which exceeded the height of seventy feet.

The highest point of the land upon which any part of the State House stands is one hundred and eight and forty-two one hundredths feet above the city of Boston base, which is sixty-four one hundredths of a foot below mean low water. The height of the top of the cornice of the Bulfinch front is one hundred and sixty-seven and five tenths feet above the city base. The height of the top of the dome, not including the lantern, is two hundred and four feet above the city base. The height of the extreme top of the lantern is two hundred and twenty-eight and five tenths feet above the city base.

The State House, with its furnishings, above the ground, is valued by the auditor at about $5,500,000, and contains the State Library, valued at about $172,000, also department libraries, and State records of which the value cannot be fairly estimated in money and which in their nature are irreplaceable.

The demurrers of the Commonwealth stated the cause of demurrer as follows: That the petitioners have not stated such a case as entitles them to have their damages determined by a jury of the Superior Court, because St. 1899, c. 457, referred to

in their petitions, provides that an owner of land within the district described in said act may have a jury of the Superior Court to determine the amount of certain damages, if and in so far as said act, or proceedings to enforce it, may deprive them of rights existing under the Constitution; and that neither said act, nor proceedings to enforce it, do deprive the petitioners of any rights existing under the Constitution.

*A. D. Hill*, for the petitioners in the first case.

*W. D. Turner*, for the petitioners in the second case.

*J. L. Thorndike*, for the petitioner in the third case.

*H. M. Knowlton*, Attorney General, *& F. T. Hammond*, Assistant Attorney General, (*F. H. Nash*, Assistant Attorney General, with them,) for the Commonwealth.

HOLMES, C. J.   These are petitions by owners of land affected by St. 1899, c. 457, to have the amount of damages assessed which have been sustained by them in their property by reason of the act.   The statute in question limits the height of buildings on a small tract west of the State House to seventy feet, and allows these petitions if and in so far as the act, or proceedings to enforce it, may deprive the petitioners of rights existing under the Constitution.   The cases are reported upon demurrer and agreed facts.

In some of the arguments addressed to us it was assumed that the only view which it was possible to take of this statute was that it was intended to benefit the State House considered as a dominant estate, and to annex to it an easement or quasi easement, whether for prospect or security it does not matter.   Manifestly this is not true.   It may be argued that the statute was passed at least as much in the interest of the public at large as travellers on the highway as it was in the interest of the Commonwealth as an owner of property — that one object at any rate was to save the dignity and beauty of the city at its culminating point, for the pride of every Bostonian and for the pleasure of every member of the State.   It is on this footing that it is argued for the Commonwealth that the act is a valid exercise of the police power; that a building law would be valid within reasonable limits; *Attorney General* v. *Williams*, 174 Mass. 476, 478; *People* v. *D' Oench*, 111 N. Y. 359, 361; Lewis, Em. Dom. § 156; that a limitation to seventy feet is reasonable, and that such a law is no less valid when passed to satisfy the love of

beauty than when passed to appease the fear of fire.    174 Mass. 479, 480.

It will be observed that this argument avoids the objection that a police law could not be limited to this narrow tract.    For all that appears, and probably in fact, the symmetry of Beacon Hill and the domination of the State House as seen from the western approaches, the Mill Dam or the Cambridge Bridge for instance, are or may be secured without restricting a larger tract, and if so the statute is coextensive with the public need.

The language of the act is, we repeat, that in so far as it " may deprive any person of rights existing under the constitution " those in the petitioners' situation may have a remedy. Of course it is possible to read this as the Attorney General would have us read it, as importing an exercise of the police power so far as the Legislature constitutionally could go, and as saving a remedy for all damages beyond the limit.    If interpreted in that way it lets in the argument just stated.    The objection to the interpretation is that it supposes the Legislature without clear words to have used the police power in one of its extreme manifestations for a purpose which, although conceded to be public, is a purpose which may be described as of luxury rather than necessity, and which, in part after all, is for the benefit of the State House land and its proprietor merely as such.    So that to sustain the restriction to its whole extent under the police power would be a startling advance upon anything heretofore done.    If it should be suggested that the restriction might be sustained under the police power beyond a certain number of feet from the ground and compensation allowed for the restriction between that height and seventy feet, apart from the difficulty of fixing a constitutional limit by feet and inches, which might not be insuperable, see *Quinn* v. *New York, New Haven & Hartford Railroad*, 175 Mass. 150, 151, the answer is that the constitutional difficulty would not grow appreciably less until we reached a point at which the restriction became nugatory because it was beyond the height to which any one would wish to build.    Apart from the difficulties which we have stated, and simply reading the words without consideration of consequences, while we can gather that the Legislature was willing to take anything without paying for it that this court

should say that it could, we do not find anything that even suggests a legislative adjudication that the public welfare requires that the petitioners' property should be restricted without compensation to them.

For the foregoing reasons we are of opinion that the construction adopted by the Attorney General must be rejected, and therefore we do not find it necessary to express an opinion whether a law, in which the Legislature, either with a declaration of purposes such as we have imagined for this act or without it, should give clear expression to its intent to restrict these buildings in the exercise of its police power without payment, would infringe the Constitution. Such a law certainly would present grave difficulties even when approached with all the presumptions that exist in favor of a legislative decision, and with the duty to uphold it unless it was impossible to do so. Compare *Farist Steel Co.* v. *Bridgeport,* 60 Conn. 278, 292, with *Attorney General* v. *Williams,* 174 Mass. 476, 479, 480. See also *Bent* v. *Emery,* 173 Mass. 495.

On the construction of the act which we adopt it treats the limits of the police power as if they were a matter which might be left to this court to fix in the first place without any preliminary exercise of legislative judgment. If it stopped here it would raise new difficulties, but it does not. It goes on and gives a remedy if the act deprives the parties of rights existing under the Constitution. In the absence of an adjudication by the Legislature that the public needs require the petitioners' property to be restricted without compensation, the statute does deprive the parties of such rights, and on the construction of the statute which we adopt there has been no such adjudication. The exercise of the police power always deprives a party of what would be his rights under the Constitution but for such an adjudication. The right to build the seventy-first foot from the ground is just as much a right under the Constitution as the right to build the sixty-ninth or the first. It may be of less importance, but it is the same in kind. The justification of a building law is not that it does not qualify or affect a right under the Constitution ; if that were the justification the petitioners would be entitled to nothing because no right of theirs would have been infringed. The justification is that although the law

affects or even takes away such rights it may do so within reasonable and somewhat narrow limits upon considerations which the Constitution cannot be supposed to have been intended to exclude.

If it be deemed more logical, instead of saying that a constitutional right is cut down or taken away under an implied constitutional power, to say that the right is limited to the extent of the lawful exercise of the police power, it does not leave the petitioners' case less strong. For under that form of statement also the right exists until the Legislature adjudicates that the public welfare requires its termination without being paid for. That, as we have said, the Legislature has not adjudicated but has left to this court.

*Demurrers overruled.*